IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

STATE OF FLORIDA,

     Appellant,

v.

CEDRIC PLUMMER,

     Appellee.

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D16-5736

_____/

Opinion filed October 6, 2017.

An appeal from the Circuit Court for Leon County.
Martin Fitzpatrick, Judge.

Pamela Jo Bondi, Attorney General, Samuel B. Steinberg, Assistant Attorney General, Tallahassee, for Appellant.

Andy Thomas, Public Defender, Laurel Cornell Niles, Assistant Public Defender, Tallahassee, for Appellee.

LEWIS, J.

     Appellant, the State of Florida ("the State"), seeks review of an order granting

postconviction relief on one of the claims filed by Appellee, Cedric Plummer, in his

motion filed pursuant to Florida Rule of Criminal Procedure 3.850. For the following reasons, we affirm the order on appeal.

The State charged Appellee with attempted armed robbery with a deadly weapon (Count I) and robbery with a non-deadly weapon (Count II) for acts that occurred on or about April 8, 2011. In Count II, the State alleged that Appellee carried a BB gun in the course of the robbery.

During Appellee's trial, Sergeant Brian Pearson was asked whether he was able to determine whether the gun at issue was in fact a handgun, to which he replied, "Well, it was a BB gun is what it turned out to be." When asked what it was about the gun that told him that it was not an actual firearm, Pearson replied:

> Well, it says, be careful, you know, don't point it at anybody. But on the tip of it it has got where the red circle used to be as far as to indicate that this is a BB gun. And that's been removed. Because most BB guns, if you look, will have a red tip on the end to identify that this is not an actual firearm. It has got a clip area where a magazine or a clip, if you want to say, goes into the grip. And that the chamber is small, BB gun.

> During his closing arguments, trial counsel argued in part:

>> The problem is, if you recall, I asked the sergeant, well, where does it say it is a BB gun? He looked at it, kind of flipped it here, turned it to the left, turned it to the right. He asked permission to look inside it. That was granted. He looked at it with his own hand and it doesn't say that.
>> So, in other words, ladies and gentlemen, we don't know what this is. The sergeant is assuming this is a BB gun. But, ladies and gentlemen, in our legal system we don't assume. These are very serious charges. We don't assume someone is guilty. . . .
>> As you recall, I asked the sergeant, well, where are the BBs?

2

There wasn't [sic] any BBs in the item. Okay. Well, what about the chamber? You will take this back. You will notice there is no clip here. I said, well, was there one with BBs in it when you found it? No. Did anybody find any BBs anywhere? No.

So the only thing we're based on, the only reason why this is called a BB gun, is because the sergeant said it was. We don't know what this is. Is it a dart gun? Is it a water gun? We don't know what it is. And just because something is labeled, not a toy, I would submit to you, ladies and gentlemen, that doesn't mean anything. In our litigious society almost everything is labeled with a warning because nobody wants to be sued. That doesn't make this a weapon.

A nerf dart set, ladies and gentlemen, has a warning to it. I certainly don't think a nerf dart set is considered a weapon. I would not be persuaded one bit by that.

Ladies and gentlemen, I will agree with Ms. Walters on one thing. Please do not leave your common sense. Obviously, everything that's labeled as this is, not a toy, does not mean it is a weapon. . . .

And, again, it is important, ladies and gentlemen, that's what [Appellee] is charged with. He is charged with having a weapon. This, ladies and gentlemen, as far as I can tell, it is not a weapon. We don't know what it is because there is no evidence other than one sergeant saying, yeah, it is a BB gun. Well, where are the BBs? There is no chamber in it. It doesn't say that. We don't know what it is. It is just an object.

I remember jotting this down as Ms. Walters was giving part of her closing. It is not what the witness thinks, but what the object is. The reason I say that is because if the sergeant or anyone else says, oh, this is a 9-millimeter Glock, that doesn't make this a 9-millimeter Glock. It is not what the witness thinks it is, it is what the object is.

This object is plastic, as the sergeant admitted. It has no BBs. It doesn't even have the red mark, as he pointed out. It is not even chambered. We don't know what it does. It is just an object that the robber allegedly had.

And based on essentially an assumption, we have a charge of robbery with a non-deadly weapon. And I submit to you, ladies and gentlemen, that simply cannot stand beyond and to the exclusion of every reasonable doubt because we don't know what this is, outside of an opinion.

Now, on page 3 . . . a weapon, quote, unquote, is defined to mean any object that could be used to cause death or inflict serious bodily

harm.

> Ladies and gentlemen, I don't believe that object can cause death or inflict serious bodily harm. We have no testimony that it can, first of all. . . . There was no evidence, testimonial or otherwise, that this object could cause death or inflict serious bodily harm.
>
> . . . .
>
> This exhibit, I believe it is Exhibit 7, which you will have in your deliberation room, the State has painted it to be – well, as a variety of things, but I suppose now it is a BB gun. The problem is we have no evidence outside of the opinion of the sergeant of what it is. No one tested it. It is just a plastic object with markings on it . . . .

The prosecutor argued in response:

> He said it is what it is. That it is not what I think, it is not what the sergeant thinks, it is not what he thinks. Correct. He's absolutely correct. It is what you think. You are the triers of fact.
> So you take this item back, and you take the evidence that is presented in front of you, including the sergeant's testimony, that he is familiar with BB guns, he is familiar with firearms. This is not a firearm. We have never alleged that it was. But the sergeant said, I am familiar with BB guns and this has every indication to him that it is a BB gun.
> And if you believe the sergeant's testimony, that is enough. That is absolutely enough for you to say, this is a BB gun, and we think it is a weapon, and we're going to find him guilty. This is enough.

The jury found Appellee guilty as charged on both counts. This Court per curiam affirmed Appellee's judgment and sentences. See Plummer v. State, 113 So. 3d 3, 3 (Fla. 1st DCA 2013).

In his Amended Rule 3.850 Motion for Postconviction Relief, Appellee raised eights claims, only one of which is at issue in this appeal. In Ground 6, Appellee alleged that his trial counsel was ineffective in failing to investigate and make a

4

determination that the alleged BB gun was actually an air pistol only capable of firing rubber darts.

During the evidentiary hearing on Appellee's claim, postconviction counsel called Josh Wright, a forensic consultant in the area of ballistics, who testified that he reviewed several photos of the gun at issue in this case, as well as the actual gun. When asked if the gun was a firearm, he replied, "It's what's referred to as an airsoft gun. An airsoft gun is not a firearm." When asked to describe an airsoft gun, he replied, "An airsoft gun is, essentially, it's a toy. . . . [I]t shoots plastic pellets and it's used for training exercises with law enforcement and military. And it's also used kind of like paintball where – and anybody can buy one of these guns and then they can kind of have battles against each other . . . ." When asked if he considered the airsoft gun to be a deadly weapon, Wright replied, "It is not a deadly weapon." When asked what led him to that opinion, he replied, "Just my familiarity with firearms, airsoft guns, the research I did on this particular airsoft gun. And being able to determine how much the projectiles weigh and how many feet per second they're moving, I can determine that there's . . . they don't do much damage to bare skin if you're fired point blank. And so, therefore, it's not a deadly weapon in my opinion." When asked if it was a BB gun, he replied, "It is not a BB gun. A BB gun fires steel either pellets . . . or copper BBs, whereas a pellet gun can shoot either BBs or lead pellets." He explained that the airsoft gun shoots plastic pellets with a lighter mass

5

than the projectiles fired from BB guns. When asked if he determined the gun to be a weapon "at all," he replied, "I determined that it was not a weapon. You can do – you can injure somebody. If you shoot them point blank in the eye, you would probably send them to the hospital. I would also say that there's some powerful squirt guns that if you take a shot straight in the eye that it would do the same thing." He described the airsoft gun as a "high end toy" that could not cause death. When asked if it could inflict serious bodily injury, he replied, "Not in my opinion. . . . [M]aybe if you got shot right in the eye and it was at a pretty close range, say within ten feet, then you could possibly get sent to the hospital. But, you know, besides that or possibly taking one down the windpipe, I don't think you're going to be seriously injured by one of these airsoft guns." Wright testified on cross-examination that "[i]f you took one right on the retina directly on the eye, maybe you would have blindness." He further testified, "I don't know of any cases where somebody's been blinded by an airsoft gun."

Trial counsel was asked during the evidentiary hearing what type of gun was involved in Appellee's case, to which he replied, "I'm trying to remember this from memory. But I believe it was a – I want to say it was a – not necessarily a BB gun but like an airsoft sort of pellet gun, something of that – something of that nature." He believed both parties referred to the gun as a BB gun at trial. When asked if there was a difference between an airsoft gun and a BB gun, trial counsel replied in part,

6

"My understanding and, again, that was – I believe understanding on both parties was that this was a – I want to say a pellet or a BB gun and I realize there are differences because of the projectile. One is a BB which is slightly different than what a pellet is. And the reason I say layman's terms or offhand because I think that was easier for everyone to understand including jurors. I am aware there is a – there are technical differences between the two."

Following the attorneys' arguments, the trial court set forth in part:

> I think the evidence that could have been presented here about what an airsoft gun is and what an airsoft gun is capable of doing would have benefitted [Appellee] greatly in refuting that aspect of the – the charge against him.
> There is a distinction between a BB gun and an airsoft gun. A BB gun can break your skin and cause problems other than in your eye. There is no evidence here that this gun was pointed at anybody's eye. So, as I read the definition . . . a non-deadly weapon would have to be used in such a way that it could cause death or permanent disfigurement. Used in such a way to cause those things. And if it was pointed at your eye from a foot-and-a-half away, it may qualify as that. But if it's held at your waist and pointed at the ground I don't know if it does.
> I think that his defense could have benefitted from testimony similar to what I heard today regarding the type – the exact type of object we had here. I want to say weapon but it's not a weapon, it's a – I think it is a toy.
>
> . . . .
>
> I think a jury would have to determine that an airsoft gun – because this was referred to as a BB gun even under [trial counsel's] testimony. There's a distinction there that might make a difference in the eyes of a jury, especially when you have a guy that comes up and says, you know, the difference between a BB gun and an airsoft gun is BB guns travel between 600 feet per second and 1200 feet per second

7

and airsoft gun is under 600 feet per second and won't break your skin and the only way it ever hurts you is if it hits you right in the middle of your pupil . . . .

But I think that there is a potential here and there is – I think you have satisfied both prongs under Strickland to convince me that that should be an issue that is put before a jury whether this is indeed a weapon under the statutes. So I do think you have a basis for a new trial on that issue.

. . . .

I do think that the jury could properly consider whether there was – the problem is the evidence here, if presented in the same fashion, would probably result in a conviction for a robbery but I'm not certain that it would be a robbery with – with a non-deadly weapon. . . .

In the Order Granting Ground VI of Defendant's 3.850 Motion for Postconviction Relief, the trial court set forth the following with respect to Ground 6:

The Defendant claims that trial counsel rendered ineffective assistance of counsel for failure to investigate and present evidence that the alleged BB gun was actually an air soft pistol only capable of firing rubber darts at a very slow speed. [Trial counsel] testified during the evidentiary hearing that he and the Assistant State Attorney were aware the gun in evidence, State's Exhibit 7, was not a "real" firearm. However, [he] also testified that he did not hire or consult with an expert to determine if the gun in evidence was a weapon. The trial record refers to the gun as a BB gun. There was no evidence during the trial to refute this description. Although [trial counsel] made an argument during his closing statements regarding how the gun was defined, stating that "we don't really know what kind of gun it is[]" there was no evidence presented during the trial by trial counsel to describe the gun, although it was in evidence and could have been more accurately described for the jury. In fact, Joshua Wright, a Ballistics expert, testified during the evidentiary hearing that in his expert opinion, the gun was a toy and could not cause death or serious bodily injury. Mr. Wright did acknowledge that if someone were shot directly

8

in the eye, that may cause some injury to the person's eye. However, there is nothing in the trial record that indicates the gun was ever used in this manner, or threatened to be used in that manner. . . . The Court finds the testimony of Mr. Joshua Wright credible, and believes that such evidence might have been sufficient to persuade a jury that no weapon was used during the robbery. Had such evidence been presented, it may have changed the jury's verdict, thus demonstrating prejudice to Defendant. The Court finds that the Defendant has met his burden in proving that [trial counsel] was ineffective as to Ground VI.

The trial court ordered that Appellee was entitled to a new trial on Count II. This appeal followed.

In order to establish a successful ineffective assistance of counsel claim, a defendant must show that counsel's actions or omissions were deficient and that the deficiency so affected the proceeding that confidence in the outcome is undermined. Johnston v. State, 70 So. 3d 472, 477 (Fla. 2011) (citing Strickland v. Washington, 466 U.S. 668 (1984)). When assessing alleged deficiency, a court must determine whether the identified acts or omissions were outside the wide range of professionally competent assistance. Johnston, 70 So. 3d at 477. There is a strong presumption that counsel's actions were reasonable. Id. "'[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.'" Id. (Citation omitted). "[C]ourts should make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

9

perspective at the time.'" Pennington v. State, 34 So. 3d 151, 155 (Fla. 1st DCA 2010) (quoting Evans v. State, 975 So. 2d 1035, 1043 (Fla. 2007)). The defendant "'must establish that no competent counsel would have taken the action that his counsel did take.'" Putman v. Head, 268 F.3d 1223, 1243-44 (11th Cir. 2001) (citation omitted). The prejudice requirement is satisfied if there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. A reasonable probability is "one sufficient to undermine this Court's confidence in the outcome of the trial. . . ." Simmons v. State, 105 So. 3d 475, 498 (Fla. 2012). In reviewing a decision of the postconviction court denying claims after an evidentiary hearing, an appellate court reviews the trial court's findings of fact, credibility of evidence, and weight of the evidence under the competent, substantial evidence standard of review. Reynolds v. State, 99 So. 3d 459, 486 (Fla. 2012). A trial court's application of the law to the facts is reviewed de novo. Id.

Appellee was charged with a violation of section 812.13(2)(b), Florida Statutes, which provides that an offense is a first-degree felony if in the course of committing a robbery, the offender carried a weapon. If no firearm, deadly weapon, or other weapon is used during a robbery, then the offense is a second-degree felony. § 812.13(2)(c), Fla. Stat. The trial court in this case instructed the jury in accordance with the Florida Standard Jury Instructions, which define "weapon" as "any object

10

that could be used to cause death or inflict serious bodily harm." Fla. Std. Jury Instr. (Crim.) 15.1.

The State argues on appeal with respect to the deficiency prong of Strickland that the trial court improperly employed a hindsight analysis, failed to give deference to trial counsel's strategic decisions, and failed to make a finding on how trial counsel's performance fell outside the "wide range standards standard." According to the State, trial counsel's testimony, his cross-examination of Sergeant Pearson, and his closing argument demonstrate that his performance was not deficient. The problem with the State's argument, however, is that while trial counsel may have chosen to undertake a strategy where he would use "layman's terms," that strategy led to a situation where the only evidence before the jury about the gun was that it was a BB gun. Rather than investigating and determining what the gun actually was, counsel repeatedly told the jury that no one knew what the plastic item was. Yet, the jury heard testimony from a law enforcement officer that the item was a BB gun. While counsel testified at the evidentiary hearing that it was "easier" for everyone to understand by simply using layman's terms, Mr. Wright testified during the evidentiary hearing that a BB gun is not the same thing as an airsoft gun. Thus, this was not a situation where Sergeant Pearson simply used another name for what the item was. Instead, he testified that it was an item that, according to the ballistics expert, it was not. Had an expert been called, the jury would have heard that the

11

gun, contrary to what Sergeant Pearson testified to, was not a BB gun. Moreover, while trial counsel testified that he did not think the technical issue concerning the gun was an issue that was necessary to address, he spent a considerable amount of time during closing arguments discussing the nature of the gun and whether it could be considered a weapon. Although trial counsel is correct that it was a jury question as to whether the gun was a weapon, the jury did not have all of the information before it necessary to make that determination because of the defense's failure to investigate the gun at issue.

The State alternatively contends that even if it could be said that trial counsel's performance was deficient, the trial court erred in determining that the deficiency prejudiced Appellee. According to the State, trial counsel made a strong argument, without Wright's testimony, that the gun did not qualify as a weapon. However, as we stated, the jury heard testimony from a law enforcement officer that the gun was, in fact, a BB gun. There was no conflicting evidence on that point. Had Mr. Wright or another expert testified on behalf of the defense that the gun was an airsoft gun and explained, as Mr. Wright did, the nature of that item and the difference between it and other guns, the jury, as the trial court found, may have determined that the item was not a weapon. While the dissent relies upon Mr. Wright's testimony that the airsoft gun could injure someone's eye in support of the conclusion that Appellee failed to demonstrate prejudice, Wright also testified that, in his opinion, the airsoft

12

gun was "not a weapon," and he likened the potential injury that the "high end toy" could cause to that of a powerful squirt gun. He also testified that he knew of no cases where someone had been blinded by an airsoft gun. Given such, we are unable to determine, as does the dissent, that no prejudice has been shown in this case. As did the trial court, we conclude that Appellee has demonstrated prejudice given that our confidence in the outcome of the trial has been undermined by trial counsel's deficient performance. We, therefore, affirm the order on appeal.

AFFIRMED.

ROBERTS, J., SPECIALLY CONCURS WITH OPINION; WINSOR, J., DISSENTS WITH OPINION.

ROBERTS, J., specially concurring.

It is well known to mothers and teachers that "BB guns are dangerous. You'll shoot your eye out."[1] A BB gun is a gun that relies on either a spring or compressed gas to propel a .177 caliber (4.5 millimeter) steel sphere out the barrel and downrange to the target.[2] The BBs weigh one-third of a gram and have muzzle velocities between 350 and 600 feet per second.[3] At these velocities, the relatively dense BB can easily penetrate an eyeball and has been known to penetrate some victims' skulls producing brain injury or even death.[4]

This airsoft gun, on the other hand, fired a six millimeter (.243 caliber) plastic projectile "anywhere between 290 and 315 feet per second."[5] These projectiles are typically less than one-fourth of a gram.[6] The lighter weight, lower velocity, and larger size of the airsoft projectiles consequently have much less striking and

---

[1] A Christmas Story (MGM/UA Entertainment Co. 1983).

[2] Wikipedia, http://en.wikipedia.org/wiki/BB_gun (last visited Aug. 2, 2017).

[3] Id.

[4] See *BB and Pellet Gun-Related Injuries – U.S., June 1992-May 1994*, Morbidity and Mortality Weekly Report (December 15, 1995) http://www.cdc.gov/mmwr/preview/mmwrhtml/00039773.htm (sixteen year old sustained a severe midbrain injury after shooting the BB through the roof of his mouth); *Boy, 10, dies after his brother accidentally shoots him in the head with a BB gun at close range*, Daily Mail Reporter (March 21, 2013, 5:31 PM) http://www.dailymail.co.uk/news/article-2297127/Boy-10-dies-brother-accidentally-shot-head-BB-gun.html (boy dies after being shot from six inches away, above his right ear, which penetrated his skull).

[5] This was testified to by Josh Wright.

[6] Wikipedia, https://en.wikipedia.org/wiki/Airsoft_pellets (last visited August 3, 2017).

penetrating power than a BB fired from a BB gun.

Other than welts on the skin, the only serious injuries ever reported for airsoft guns are eye injuries. Most of these eye injuries are non-penetrating and usually result in full recovery; however, penetration with loss of eyesight has occurred.[7]

The jury was required to determine whether the gun used in this case was a weapon as defined in the Florida Standard Jury Instruction. Dale v. State, 703 So. 2d 1045, 1046 n.1 (Fla. 1997). A weapon is defined as "any object that could be used to cause death or inflict serious bodily harm." Id. at 1047; Fla. Std. Jury Instr. (Crim.) 15.1. Defense counsel's failure to determine that the gun used in this crime was an airsoft gun rather than a BB gun and to present that information to the jury was deficient. Given the significant difference in energy and wounding potential between a BB gun and an airsoft gun, it is likely that the jury would have reached a different result. If counsel had thoroughly investigated the weapon used, he may have been able to effectively bring out these differences through cross-examination and show that the weapon was not being used in a way that would inflict serious bodily harm.

---

[7] Tarek A. Shazly, MD, & A. K. Al-Hussaini, MD, *Pediatric Ocular Injuries From Airsoft Toy Guns*, 49 J. of Pediatric Ophthalmology & Strabismus 54, 54-57 (2012) (review of ocular injuries to children from airsoft guns).

WINSOR, J., dissenting.

Even if the court were correct—even if any competent attorney would have rounded up an expert to say Plummer's "weapon" was not a BB gun but an airsoft pistol—we should reverse. Deficient performance gets you only halfway there. Plummer had to also show prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), and he didn't.

I.

A jury convicted Plummer of robbing a Circle K with a weapon. At trial, the State presented the "weapon," which a police officer testified was a BB gun. Plummer's trial attorney challenged this testimony, extensively cross-examining the officer and arguing to the jury that the officer was simply making an assumption. In closing, counsel argued that "[w]e don't know what this is. Is it a dart gun? Is it a water gun? We don't know what it is."

The court instructed the jury that a "weapon" was "any object that could be used to cause death or inflict serious bodily harm." *See also* Fla. Std. Jury Instr. (Crim.) 15.1.[1] Plummer argued the gun didn't meet this definition, the State argued it did, and the jury sided with the State.

---

[1] Florida's robbery statute enhances the offense degree when the offender "carried a weapon," but the statute does not define what qualifies as a weapon. § 812.13(2)(b), Fla. Stat. (2010). Plummer does not challenge the instruction on what constitutes a "weapon" for these purposes, and the supreme court has called the definition used here "a correct statement of the law," *Dale v. State*, 703 So. 2d

16

Plummer then filed a postconviction motion, claiming (among other things) that counsel should have investigated whether the gun was in fact a BB gun. At the postconviction hearing, Plummer's ballistics expert said the pistol was *not* a BB gun but an airsoft gun, essentially a toy.[2] The expert explained that the gun shoots plastic pellets, unlike BB guns, which shoot metal projectiles (otherwise known as BBs). He opined that the gun was not a weapon and would not likely cause serious injury. But he then acknowledged "maybe if you got shot right in the eye and it was at a pretty close range, say within ten feet, then you could possibly get sent to the hospital." Similarly, he said that "[i]f you took one right on the retina directly on the eye, maybe you would have blindness." At the same evidentiary hearing, Plummer's trial attorney testified that he did not think an expert was necessary; he believed the jury could decide whether the gun was a "weapon" as defined in the jury instructions.

The lower court found that evidence that the "weapon" was an airsoft pistol and not a BB gun might have been enough to persuade the jury that Plummer did not carry a "weapon" when he robbed the Circle K. The court concluded Plummer had met his *Strickland* burden, and it ordered a new trial. This court reaches the same wrong conclusion.

---

1045, 1046 (Fla. 1997).

[2] As the jury heard, the gun said right on it: "Not a toy, 6-millimeter caliber model. Wear eye protection to prevent serious injury to the eyes."

## II.

To show sufficient prejudice, Plummer had to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As already noted, Plummer's own expert testified that an airsoft gun *could* cause permanent injury: he acknowledged that it could cause blindness or other hospital-worthy injuries.[3] Even if counsel were deficient for not finding someone to offer that very opinion, we should not say there is a reasonable probability that the verdict would have been different. In other words, we should not say there is a reasonable probability that the jury would have found the gun *could not* inflict serious bodily harm after hearing Plummer's own expert admit the gun *could* inflict serious bodily harm. Because Plummer failed *Strickland*'s prejudice prong, we should reverse.

---

[3] Although we should limit our review to the record, it is noteworthy that the expert's acknowledgment is consistent with the wide-ranging, extra-record materials the special concurrence marshaled. *See* Concurring Op. of Roberts, J., at 2 & n.7 (noting that airsoft guns have caused "penetration with loss of eyesight" (citing Tarek A. Shazly, MD, & A. K. Al-Hussaini, MD, *Pediatric Ocular Injuries From Airsoft Toy Guns*, 49 J. of Pediatric Ophthalmology & Strabismus 54, 54-57 (2012))).