# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D19-4166

_____

STATE OF FLORIDA,

    Appellant,

v.

ANDREW KING,

    Appellee.

_____

On appeal from the Circuit Court for Duval County.
Marianne L. Aho, Judge.

September 9, 2021

KELSEY, J.

Based on one argument among sixteen raised in Appellee's postconviction motion alleging ineffective assistance of trial counsel, the postconviction court vacated Appellee's convictions and three consecutive life sentences. The jury had convicted him of first-degree murder of an adult woman and her full-term, unborn quick child, and armed burglary. We reverse.

## I. Rule 3.850 Standards.

A movant invoking Florida Rule of Criminal Procedure 3.850 must establish both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The deficiency prong requires a showing that no reasonably competent lawyer would have performed in the challenged manner; in other words, that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*; *see also Skrandel v. State*, 830 So. 2d 109, 115 (Fla. 4th DCA 2002). The prejudice prong requires a showing that but for counsel's deficient performance, it is reasonably probable that the jury would have reached a more favorable verdict. *Strickland*, 466 U.S. at 694.

In deciding a 3.850 motion, the trial court should make "every effort" to "eliminate the distorting effects of hindsight." *Id.* at 689. The trial court's reasoning and decision must be supported by competent, substantial evidence. *See Sochor v. State*, 883 So. 2d 766, 771–72 (Fla. 2004). While we defer to the trial court's conclusions supported by such competent, substantial evidence, our deference is neither blind nor absolute. We do not defer to findings unsupported by such evidence. *See id.* at 772–73.

We review de novo the court's legal conclusions on deficient performance and prejudice. *Id.* at 781. While we respect very much the trial court's detailed assessment of this complex case, our application of the governing legal principles on the record presented leads us to conclude that the trial court's decision was not supported by competent, substantial evidence. Appellee did not demonstrate either deficient performance or prejudice.

## II. Proceedings Below.

These convictions resulted from Appellee's third trial on the same charges. The same trial judge presided over the three trials within a fifteen-month span from June of 2012 to September of 2013. Appellee had the same two very experienced defense lawyers in all three trials. In the first two trials, the State sought the death penalty, and the trials ended with hung juries. To avoid a twelve-

2

person capital jury in the third trial, Appellee asked the State to drop the death penalty claim, and the State did.

Appellee did not testify at any of his trials or at the 3.850 hearing, but his defensive theory was that his then on-and-off girlfriend, who lived with the victim, committed the murder and staged the scene to frame him. The six-person jury in the third trial convicted Appellee as charged, after deliberating less than two hours. Appellee raised only a *Williams*-rule argument on his direct appeal, and we per-curiam affirmed Appellee's judgments and sentences. *King v. State*, 156 So. 3d 1080 (Fla. 1st DCA 2015) (Table).

Appellee's 3.850 motion was pro se, but his new postconviction counsel adopted it and argued for Appellee at a hearing before another judge, not the one who had tried the case.[1] The sole argument on which the postconviction court granted relief was number ten: that Appellee's trial counsel was ineffective for failing to introduce evidence of a "temperature discrepancy" between the inside and outside of the house where the murder occurred.[2]

---

[1] Postconviction motions often go before a judge other than the trial judge. There is nothing wrong with that, although it leaves the postconviction court unable to make credibility determinations of trial witnesses.

[2] Appellee's pro-se motion under Rule 3.850 also raised the following arguments, which the trial court rejected and which Appellee did not appeal or cross-appeal: 1) failure to move to dismiss the indictment, 2) failure to move to suppress the testimony of the State's jailhouse informant, 3) failure to object to certain of the State's comments in closing as prejudicial, 4) failure to object to the State's closing comments disparaging the credibility of defense counsel and the plausibility of the defensive theory, 5) failure to object to the State's closing comments on Appellee's silence, 6) failure to object to the State's use of a prior inconsistent statement by Appellee's mother as substantive evidence, 7) defense counsel's stipulation to the State's introduction of cellphone records that the State had not provided to the defense, 8) failure to call three witnesses to impeach the girlfriend's testimony, 9) failure to object to prejudicial evidence

3

### III. The Lead-Up and the Murder.

The murder likely occurred between 4:00 and 8:00 a.m. on Tuesday, June 8, 2010, in Arlington, on the southeast side of Jacksonville. Because the evidence developed at trial is necessary to evaluate the prejudice prong of *Strickland*—i.e., whether counsel's alleged deficiency reasonably could have made a difference in the outcome—we set out the relevant facts at some length. This is especially necessary when the defense is that another person committed the murder, because the analysis involves the comparative likelihood of guilt of two persons rather than the defendant alone.[3]

Since March of 2010, Appellee's girlfriend had a full-time day job, and also had been attending night classes to become a medical assistant, which she described as an aide "below a nurse." The classes lasted four to five hours a night, Monday through Thursday.

The girlfriend rented a small house of about 700 square feet. In April, she allowed the victim to move in, in exchange for babysitting and housekeeping services during the many hours a day when the girlfriend was at work or school. The victim, who was pregnant, was the paternal aunt of the girlfriend's two-year-old son, who also lived at the house. There was some evidence of a contentious relationship between the victim and the girlfriend,

---

concerning the unsolved murder of the informant's father, 11) failure to object to the State's prejudicial opening comments on Appellee's mental state, 12) failure to object to the State's closing argument that a motive for the killing was established, 13) failure to object to prejudicial hearsay testimony from the lead detective and the girlfriend about the victim's fear of Appellee, 14) failure to object to improper opinion testimony from the girlfriend that she believed Appellee was responsible for breaking into the home and re-arranging things, 15) failure to object to hearsay testimony from the lead detective concerning the content of text messages sent among several witnesses, and 16) cumulative error.

[3] In addition, our detailed analysis may facilitate any further review for future state and federal courts.

including an incident in May when the victim hit the girlfriend in the head.

Appellee moved into the home after the victim did. The two had a contentious relationship. The victim did not like Appellee, was often rude and malicious toward him, and tried to convince the girlfriend to leave him. Appellee demanded that the girlfriend choose between him and the victim, because he would not stay while the victim was living there. Given the ultimatum, the girlfriend chose to keep the victim there. Appellee blamed the victim for coming between him and his girlfriend. He moved in with his mother only five blocks away.

Shortly after that, on May 12, Appellee committed criminal mischief at the house, which he admitted, and for which he was placed on probation. Appellee had been asking the girlfriend to return his laptop computer, which she refused to do and told him (falsely) that it was gone, which made him angry. The girlfriend, her son, the victim, and a third person—whom Appellee erroneously thought was another of the girlfriend's boyfriends— were in the house. The front door was not locked, and Appellee still had keys to the house. Appellee came to the house armed with a claw hammer and demanded entry, which was refused. Appellee flew into a rage, kicked through the wooden panel at the bottom of the front door, and used the hammer to break the glass in the front door, sticking his head through the opening.

Police were called. Appellee waited for them without fleeing, and admitted guilt. He was found guilty of criminal mischief and ordered to stay away from the residence. Nevertheless, he and the girlfriend resumed their intimate relationship. About two weeks after that incident and two weeks before the murder, on May 24, the girlfriend suffered a miscarriage.

On June 4, Appellee brought a lawn mower to the girlfriend's house and mowed the grass. He also cut a hole in the drywall for the dryer vent. The girlfriend later testified that the tool he used to cut the hole had "teeth" on it. No such tool was ever found.

On June 6, two days before the murder, the girlfriend had to take the victim to the hospital because the victim was experiencing

labor pains, which turned out to be a false alarm. Appellee stayed at the house babysitting for the girlfriend's child while the two women were at the hospital. They returned home late, and the following morning, June 7, the two women had a fight in which the victim stated she wanted to leave.

Later that day when the girlfriend was going to her night class after working her day job, the victim called the girlfriend and told her that her son (the girlfriend's) had received a large number of ant bites and needed to go to the hospital. The girlfriend went home, picked up her son and the victim, and headed to the emergency room. The victim insisted on stopping to eat first, which irritated the girlfriend. Ultimately, after they waited for several hours without being seen at the emergency room, the boy seemed better, so they went home and put him to bed. By then it was after eleven o'clock. Around midnight, Appellee came to the home and took out the trash, which apparently was not unusual. At 1:05 a.m., there was a phone call from the girlfriend's phone to a man who lived in Palatka, and evidence later indicated that the victim had called him using the girlfriend's phone because she wanted to leave Jacksonville and go back home to Palatka.

A little before 1:00 a.m., Appellee had received on his phone evidence that the girlfriend had sent a topless picture of herself to another previous boyfriend. Appellee's mother later testified that she saw Appellee at her house at 1:00 a.m. with his phone, and he told her about this picture. This news set off an exchange of tense texting and phone calls between Appellee and the girlfriend. The girlfriend was also irritated that Appellee had not returned a baby bed, saying they would need it for the victim very soon. Around 3:26 a.m., Appellee texted the girlfriend that he was going to leave his keys to her house at the end of her driveway, "so that I don't get accused of something I didn't do." He also texted that he was already walking through the neighborhood. The girlfriend later testified that the victim advised her not to go outside, but the girlfriend checked the driveway anyway and the keys were not there.

Phone and text records later showed that Appellee's texts continued until 3:49 a.m. The girlfriend stopped responding to Appellee's texts around 2:00 a.m. Appellee texted the girlfriend's

aunt, with whom he was friends, at 2:00 a.m. He said he really needed to talk to her. She did not respond. The last outgoing phone call from the girlfriend's phone was to another man (the one to whom she had sent the topless photo) at 3:25 a.m.

The girlfriend testified that she went to bed about 4:00 a.m., setting ten alarms on her phone to ensure she would wake up for work. She put the phone, plugged into its charger, on her pillow. She put her glasses on her nightstand. There is no evidence of any texts or calls initiated by, or answered by, the girlfriend or the victim between approximately 4:05 a.m. and 10:25 a.m. on June 8.

Appellee called the girlfriend's cell phone at 3:12, then called the landline phone at 3:18, 3:20, and 3:22. None of these calls was answered. His last text to her was at 3:49 a.m. He did not call or text the girlfriend between 3:49 and 5:28 a.m. Between 5:28 and 5:38 a.m., he called her three times using *67 (to block incoming caller identification). At 5:44, he called again, without using *67. She did not answer any of these calls. He made no calls between 5:44 and 8:02 a.m.

Appellee's mother, a school-bus driver, testified that after she had talked to him at 1:00 about the topless photo, he was not at her house at 3:30 when she got up to make coffee. At about 5:00 when she left for work, he was at her house on the couch where he routinely slept, appeared to be sleeping, and was fully covered up; she kept the house cold inside. When she got home at 8:00, he was again not home, so she called him at 8:19. He arrived within two to three minutes, and asked to use her washing machine to wash some of his clothes—something she testified he had never done before.

Appellee texted the girlfriend's aunt at 9:06 a.m. and called her at 9:08. There was no indication from the aunt's testimony that Appellee knew anything about the murder. Appellee texted a friend at 8:02, saying he was at work, which a detective later testified was false. The record does not establish the time at which Appellee would have learned from someone else that the victim had been killed.

The girlfriend testified that she awoke around 10:00 a.m. even though it was a workday and she had set multiple alarms on her phone to ensure that she got up on time. She noticed that her phone and glasses had been moved and were not within reach where she had put them. She saw two pieces of yellow rope on her bedroom floor (a nylon fish stringer with a sharp piece of metal on one end and a loop on the other), which she had never seen before; and part of one of her t-shirts on the bed pillow next to hers. She found her phone and glasses in the living room. She took pictures of the rope and her torn t-shirt with her phone.

The girlfriend called out to the victim, who was sleeping on her left side at her usual place on a love seat in the living room. The victim's face was uncovered and her right arm was outside of the cover as well. The victim did not respond, which the girlfriend said was normal for the victim. The girlfriend checked on her son, who was still sleeping. She testified that she did all of this without realizing that the victim was dead, and without noticing the victim's visible injuries and blood.

At 10:25, the girlfriend called her aunt and told her what she had seen, suggesting Appellee was trying to scare her, which the girlfriend later testified Appellee had previously tried to do. The girlfriend's aunt suggested she check to see if her car was still there, so when her son got up, the girlfriend got her car keys from an end table within inches of the victim's head, and went outside to check her car. She saw that the landline phone wire was cut and the cable was unhooked (not cut). Appellee used to work for a cable company and had installed her cable for her.

The outside laundry room door at the back of the house was ajar. The door from the laundry room into the kitchen was also open. Appellee's keys to the house were on the dryer. She took more pictures and sent them to her aunt. When she went back through the kitchen into the living room, her son was asking the victim to turn on cartoons, but the victim did not respond. The girlfriend testified that at this point she saw something dark coming from the victim's mouth, which she thought was drool or food, because the victim often ate pudding or candy before falling asleep. The girlfriend then pulled the covers off of the victim and saw that she appeared to be dead.

8

She called her aunt first, who told her to call 911, which she did at 10:50 a.m. She first reported a break-in and told the 911 operator that a rope and cloth had been left near her, before reporting that her friend would not wake up and had blood "all over her face." The operator asked if rescue was needed, and the girlfriend said she thought the victim was dead, and that Appellee had done it. During the 911 call she said that she had found her phone in the laundry room, but at trial she testified she found it on the kitchen table in the dining area.

First responders arrived by 10:57, and the girlfriend, holding her son, was outside hysterically shouting something that sounded like an intruder had gone out a back window. Two responders briefly entered the house, saw that the victim was dead, and went back outside. A second team of several officers conducted a protective sweep of the house. Because the goal was to make sure no one was hiding under the piles of clothes and other significant clutter in the house, an officer admitted at trial that it was possible that they disturbed items in the house. There was no evidence of forced entry at any door or window.

Detectives then started photographing the scene. They found the back door open, two pieces of yellow rope like a "fish stringer" separated by a few feet on the floor of the girlfriend's bedroom, a kitchen knife on the floor, a piece of the girlfriend's yellow t-shirt on the pillow next to the girlfriend's, and the sheath of a fish fillet knife on the top bunk in the boy's room next to a sippy cup. The only blood they found was on the victim's body and on the love seat under her upper torso. A second sweep the next day turned up another piece of the girlfriend's yellow t-shirt in the bathroom.

At trial, the defense presented evidence that the pictures the girlfriend took and sent to her aunt differed from the pictures detectives took, suggesting the girlfriend had moved items (including the sippy cup) after she took her pictures, in an effort to frame Appellee. The defense also pointed out that investigators failed to check drains in the house for evidence of blood, failed to test for fingerprints in obvious places like the back door and the keys found on the dryer, and failed to look for the missing knife or any other evidence in a shed behind the house or in the girlfriend's

car parked outside. The defense argued that although Appellee washed some clothes the morning of the murder, the shoes he had been wearing were not washed or cleaned, and bore no evidence of blood or anything else incriminating.

When police went to apprehend Appellee, they initially went to the wrong house, across the street from his mother's. He was outside on his porch the whole time, watching them. He made no attempt to flee.

Appellee's mother reported to police that a fish fillet knife was missing from her house, and she believed she had just used it within the previous few days, after June 4 (when Appellee mowed the girlfriend's lawn and cut a hole for the dryer vent). At trial, she admitted it might have been the previous Memorial Day holiday when she last used it—before June 4. She also testified that she used to fish, and the yellow fish-stringer rope looked like one that had been on her front porch just recently but had gone missing. The defense argued that Appellee could have used the rope to tie his lawnmower down when driving to the girlfriend's house (presumably in the vehicle shown in evidence pictures, a Chevy Blazer SUV, although the picture showed tread separating from a front tire, which Appellee mentioned in a June 5 text message). Defense counsel argued Appellee could have used the fish fillet knife to cut a hole in the wall for the dryer vent. The girlfriend disagreed, testifying that Appellee had used a small saw with teeth to cut the hole. The tool used to cut the dryer hole was never found.

Appellee's mother also identified the knife sheath found at the murder scene as the one missing from her house. Appellee's DNA was the major contributor to the DNA on the knife sheath and the rope, while none of the girlfriend's DNA could be identified on those items. The t-shirt had DNA from both Appellee and the girlfriend on it.

At trial, the State presented testimony from a jailhouse informant, who said Appellee had confessed in full to him, including details not available to the public. This informant claimed that Appellee had told him he put a pillow over the victim's face during the murder, but no such pillow was ever found, and there was no forensic evidence indicating that a pillow had been

10

used. The informant said he made notes of what Appellee told him, then destroyed the notes, but then prepared a summary for prosecutors. The defense vigorously impeached him based on his destruction of his purported notes, as well as on his prior felony convictions and his motive to help the State for favorable treatment (though none had been offered at that time). The defense also suggested the informant had accessed Appellee's legal papers, including police reports, kept in his cell (though the two did not share a cell but were housed in the same pod).

The medical examiner testified that the victim was killed by multiple stab wounds with a blade consistent with that of a fish fillet knife. He owned and used one and was quite familiar with its characteristics. The stab wound that likely happened first penetrated downward behind the victim's upward (right) ear over 10 centimeters (3.9 inches) deep, nearly severing the victim's spinal column. This would have rendered her unable to defend herself or to call out, except for perhaps a brief sound or two. A second major stab wound entered on the back of the victim's upward (right) arm and penetrated nearly ten inches through the chest into the lung, severing major arteries. The medical examiner testified that the victim would have died in "a large number of seconds to a small number of minutes."

The medical examiner had testified in the second trial that there were no blowfly eggs on the body, and that the absence of blowflies or larvae was not unusual because blowflies do not always come to a body, especially one indoors; and their arrival time is not precise in any event. Blowfly evidence was not elicited in the third trial.

The victim's full-term baby girl was removed from her mother's body during the autopsy. The medical examiner testified that the baby was perfectly normal and would have lived if her mother had not first died.

**IV. The Temperature Issues.**

Appellee's girlfriend called 911 at 10:50 a.m., and police arrived at 10:57. The back door from the laundry room to the outside, which was at the very back corner of the house, was open

far enough that a person could walk through it, and the door between the laundry room and kitchen was also open. There was no official weather information in evidence to establish the area's temperatures during the relevant time of the previous night through the afternoon's investigation.

The lead detective testified that she responded to the scene at 12:22 p.m., and *did not enter the house that day*. Instead, she went directly to where other detectives had placed the girlfriend, and took her to the station to be interviewed. She nevertheless testified that her written report (which was not itself entered into evidence) indicated the inside temperature was 70 degrees and the outside temperature was between 75 and 78 degrees. She was not asked to, and did not, explain when the temperature readings were made or by whom, given that she did not enter the house until the following day, June 9. Further, there was no evidence about how someone arrived at these temperatures; i.e., whether by subjective estimate or through some objective measurement.

In the second trial, a detective testified that the outside temperature was in the 90s, but that testimony did not come into the third trial. The postconviction court sua sponte resolved the discrepancy between the second and third trial testimony in favor of "finding" that the outside temperature was 75 to 78 degrees.

One of the evidence technicians, who took photographs mostly inside the home around mid-day into early afternoon on the day of the murder, testified that it was hot and they had to change gloves frequently. This evidence technician took a picture of the thermostat inside the home. The picture shows a digital display, with the number "79" in large digits filling most of the screen. On a level with the bottom of the numbers and to their left was the word "TEMP." Below both "TEMP" and "79," and centered at the bottom of the display, was the word "COOL." Here is the picture:



No record evidence, neither photographic nor testimonial, indicated where the thermostat was mounted. Nor was there any evidence about how it functioned or whether it was functioning properly at the time. There was no evidence establishing whether the "79" on the display was indicating the existing interior temperature or the temperature that would trigger the cooling function to start. There was no evidence about whether the reading was accurate, whether the air conditioning function was operational, or whether it came on at any time while law enforcement personnel were in the house.

There was also no scientific or expert evidence about what the inside temperature should have been if the thermostat had been set to avoid cooling, in light of the relevant variables including actual outside temperatures the previous night and the morning of the murder. In addition, evidence pictures showed that the back half of the house was shaded with mature trees, but there was no evidence or discussion about how factors such as shading or insulation efficiency of the house would affect the inside temperature, nor about how a door left open at the back corner of this particular house would affect the temperature in the remainder of the house in light of all other variables.

The thermostat picture was a trial exhibit admitted into evidence in both earlier trials. In the first trial, defense counsel asked the evidence technician if the thermostat was "set to" 79, and she agreed; but in the second trial she testified simply that it "was at" 79. In closing argument, defense counsel briefly mentioned the thermostat only as an example of detailed police work, and did not present any argument about a temperature

discrepancy. In the second trial, defense counsel argued in closing that it could not have been 70 in the house if it was 90 degrees outside and the doors were open. He did not mention the thermostat.

At the beginning of the third trial, counsel for both parties stipulated into evidence the previous trial exhibits, including the picture of the thermostat. At the end of the trial, the judge instructed the jury that items in evidence would go back to the jury room with them and they could refer to the evidence. However, other than questioning the detectives about the conditions they encountered at the house, Appellee's trial counsel did not ask additional questions about the temperatures or the thermostat, nor mention the temperatures in either opening or closing argument.

### V. The Postconviction Hearing.

In relevant part, Appellee's postconviction counsel argued that the thermostat picture would have supported Appellee's defensive theory that his girlfriend committed the murder and then staged the murder scene to frame him. Counsel argued that if, as the girlfriend maintained, the back door of the house had been open for at least several hours before she woke up at 10:00, it would have been warmer inside than the 70 degrees reflected in the lead detective's report. Postconviction counsel assumed, without supporting evidence, that the thermostat picture meant that the system had been set so that the air conditioning would not come on until the inside temperature reached 79 degrees, and that the weather conditions and other factors were such that the house would have been warmer to a meaningful degree without the girlfriend's interference.

During testimony at the evidentiary hearing, postconviction counsel asked one of Appellee's trial lawyers if there had been any reason to omit the picture of the thermostat in the third trial. He said no. Trial counsel explained that he and his co-counsel had originally considered the thermostat only potentially relevant to a blowfly defense; i.e., that if the girlfriend's story were true, there would have been blowflies and probably larvae on the body by the time the body was collected. But once the medical examiner

testified that there were no larvae on the body, and that blowflies are not that predictable at all and it was not surprising that there was no blowfly activity, that argument was no longer viable. So, for strategic reasons, they did not believe the thermostat would have helped them.

The postconviction court took the matter under advisement, and then sua sponte ordered the State to file the trial transcripts from the first two (capital) trials, which the State did. After reviewing those earlier transcripts, the court entered the order on appeal, addressing each of the sixteen issues. The court did not hold a new hearing about the earlier transcripts (but neither did the State move for rehearing afterwards). The court vacated all of Appellee's convictions and sentences based solely on the temperature-discrepancy argument: "[T]his Court finds trial counsel performed deficiently by failing to present any evidence or argument regarding the inside/outside temperature discrepancy and the seventy-nine degree thermostat setting at [Appellee's] third trial."[4]

The postconviction court relied upon the "evidence" that the thermostat was "set to" 79 degrees, that it was 70 inside, and that it was 75 to 78 degrees outside—sua sponte resolving in favor of these lower outside temperatures the inconsistency between the 75/78-degree evidence and a detective's earlier testimony that it was in the 90s. The court concluded that because evidence of a temperature discrepancy, including the thermostat picture, was introduced in the first two hung-jury mistrials, and not in the third trial (which is inaccurate, as noted above), that must have been the reason the third jury reached a verdict and convicted Appellee.

The postconviction court found it a "relatively convincing defense" that the girlfriend committed the murder and then

---

[4] The postconviction court noted the desire to "make[] clear that counsel [were] not deficient in carrying out their duties at any other point while representing Defendant during his three trials. In fact, counsel's prior representation resulted in two hung juries, which highlights the skill, professionalism, and commitment trial counsel exhibited during the course of representing Defendant."

framed Appellee for it. The court described the girlfriend's testimony about her conduct on the morning of the murder "borderline outlandish under the circumstances." The court further noted that "the various objects strewn about the house suggesting Defendant was the perpetrator would be something you would expect to find if someone was trying to frame someone else for a crime." The court found the temperature discrepancy "strong physical evidence" that "may have very well" caused the jury to come to a different conclusion, because "it would be impossible for the inside temperature of the house to have been seventy degrees when the thermostat was set to seventy-nine degrees and one of the doors had been left open for hours to an outside temperature in the mid-to-high seventies." The court therefore concluded that there was a reasonable likelihood that Appellee would have been acquitted if his defense counsel had presented additional evidence and argument about the temperatures and the thermostat. Thus, the court found that the thermostat evidence alone was sufficient to satisfy both the deficiency and the prejudice prongs of *Strickland*. We will now explain why we respectfully disagree.

## VI. Applying *Strickland*.

### A. Lack of Competent, Substantial Evidence.

As noted above, we must defer to the postconviction court's findings of fact to the extent that they are supported by competent, substantial evidence. On the other hand, we do not defer to conclusions not rooted in competent, substantial record evidence, or those that amount to speculation or assumptions. *See Calhoun v. State*, 312 So. 3d 826, 846 (Fla. 2019) (rejecting "speculation and conjecture" as a basis for relief where the effect of evidence is not clear) (quoting *Conner v. State*, 979 So. 2d 852, 863 (Fla. 2007)); *Holden v. Holden*, 667 So. 2d 867, 869 (Fla. 1st DCA 1996) (noting "guesses or assumptions" are not competent evidence to support a factual conclusion); *State v. Miller*, 46 Fla. L. Weekly D1775, 2021 WL 3436343, at *3–4 (Fla. 5th DCA Aug. 6, 2021) (rejecting as lacking competent, substantial evidentiary bases the trial court's conclusions about potential cell phone GPS data, where the record lacked evidence that the data existed or that it would favor the defendant). We find that postconviction counsel's arguments rested on assumptions, and on multiple facts not supported by

16

competent, substantial evidence. The same flaws flowed through to the order under review, which also mistook the scope and import of the evidence and argument in the first two trials.

As we have noted already, Appellee's trial counsel did not present argument about the thermostat picture and temperature discrepancy in either of the first two (capital) trials. The records of the first two trials show, to the contrary, that although the thermostat picture was admitted into evidence in both trials, counsel did not present argument about temperature discrepancy in the first trial. In the second trial, counsel argued temperature discrepancy based solely on the lead detective's reported 70-degree inside temperature and an evidence technician's testimony about the 90-degree outside temperature. The thermostat did not factor into that argument. Therefore, the comparison of the third trial to the first two was not supported by the record evidence.

On top of that factual misapprehension about arguments made in the first two trials, the postconviction court stacked the conclusion that the thermostat evidence is what *caused* the first two juries to hang, resulting in mistrials. This is conjecture and not supported by evidence. It is impossible to conclude to the requisite level of evidentiary certainty that any one issue made the difference between the earlier mistrials and the verdict in this case. It could just as easily, or more likely, have been the difference between a capital and a six-person jury, among other factors. This part of the analysis partakes of inappropriate hindsight, which cannot form a valid basis for postconviction relief. *See Strickland*, 466 U.S. at 689 (cautioning against the "distorting effects of hindsight").

In addition, the evidence of the 70-degree inside temperature lacked a factual foundation. That figure came exclusively from the lead detective's report, but she testified that she did not enter the house until the next day. Since she was not in the house on the only relevant day, and there was no evidence of where the 70-degree number came from, her testimony was not competent to establish that inside temperature as fact. *See Rivera v. State*, 859 So. 2d 495, 507 (Fla. 2003) (affirming trial court's exclusion of witness testimony not based on personal knowledge, as not competent to support postconviction relief). Because no other

evidence established the inside temperature that day, no factual foundation supported the conclusion that it was 70 degrees inside the house when law enforcement arrived. *See Williams v. State*, 257 So. 3d 1192, 1196 (Fla. 1st DCA 2018) (quoting section 90.604, Florida Statutes, for the proposition that "a witness may not testify to a matter unless evidence is introduced which is sufficient to support a finding that the witness has personal knowledge of the matter").

Without competent evidence that the inside temperature was 70 degrees, the remaining record evidence established only that it was hot inside the house. Another detective, an evidence technician, testified that it was in the 90s outside and hot inside the house as they were taking photographs and collecting evidence. Further, no evidence or argument addressed other related issues about the weather the night before and the morning of the murder, nor the effect of other potentially relevant factors such as shading and insulation and the open back door. The defense did not have sufficient competent, substantial evidence to establish the inside temperature, so there was no foundation for a "temperature discrepancy" argument. Thus, the postconviction court's determinative conclusions about the inside and outside temperatures lack an appropriate evidentiary basis.

The thermostat picture does not provide the necessary competent, substantial evidence, because it is inconclusive. The court's conclusions that the thermostat was "set to" 79 degrees, that the air conditioning would not come on until the interior temperature reached 79, that the inside temperature was below 79, and the ultimate conclusion—that the girlfriend may have so set the system to help the house warm up quickly—are all based on assumptions about how the thermostat functioned. No evidence of any kind, from a fact or expert witness, established how the thermostat worked and what the display indicated. On its face, the picture shows that the word "temp" is aligned with the "79," suggesting "79" indicates the temperature in the house. In fact, Appellee stated in his pro-se 3.850 motion that the "79" indicated the temperature inside the house, and he suggests the same in his initial brief before us (while also arguing that the number reflects a setting).

The lack of definitive evidence establishing the significance of the "79" on the thermostat display, particularly in light of incompetent or inconclusive evidence about inside and outdoor temperatures, reduces the picture of the thermostat to the status of inconclusive at best. Argument about it would have been speculative. This does not constitute competent, substantial evidence and does not support Appellee's postconviction motion. *Cf. State v. Plummer*, 228 So. 3d 661, 667–68 (Fla. 1st DCA 2017) (finding competent, substantial evidence to support 3.850 relief where armed-robbery defendant presented expert testimony at postconviction evidentiary hearing conclusively demonstrating that the weapon used in the robbery was an airsoft gun (a nondeadly weapon) rather than a "true" BB gun (a deadly weapon)—thus negating an element required to convict the defendant of a first-degree felony).

## B. Deficiency under *Strickland.*

We review the factual components of the postconviction court's deficiency conclusion for competent, substantial evidence; and the legal conclusion of deficiency de novo. *Sochor*, 883 So. 2d at 772. Counsel are not deficient under *Strickland* unless they perform below minimum constitutional standards. 466 U.S. at 687; *see also Ponticelli v. State*, 941 So. 2d 1073, 1094 (Fla. 2006) (holding that deficiency under *Strickland* means counsel's performance fell "below an objective standard of reasonableness").

Because the thermostat picture and argument about the temperature discrepancy lack a legally sufficient evidentiary basis under *Strickland*, we reverse the related finding that counsels' performances were deficient. The thermostat picture was in evidence in the third trial, but because it was inconclusive and other evidence necessary to develop the temperature-discrepancy defense was not competent or was nonexistent, counsel were not deficient for failing to argue this theory in opening or closing. As the postconviction court noted, Appellee's trial counsel were very highly experienced and performed admirably, and well within the *Strickland* standards. The available evidence about the thermostat and the inside and outside temperatures was inconclusive at best. Working with what they had and refraining

19

from advancing arguments not supported by competent evidence, counsel were not deficient.

## C. Prejudice under *Strickland*.

Again for the prejudice prong of *Strickland*, our review is for competent, substantial evidence as to facts, and de novo as to the legal conclusion of prejudice. *Sochor*, 883 So. 2d at 772. Applying these standards, we do not find that there is a "reasonable probability" that the result would have been different if defense counsel had been able to, and did, argue the temperature discrepancy at trial.

The postconviction court reasoned that this argument would have added weight to the defense theory that the girlfriend was guilty of the murder, especially since the timeline and the evidence of the girlfriend's actions the morning of the murder were "borderline outlandish under the circumstances." We cannot disagree with the court's characterization of the evidence against the girlfriend. She was on scene and alone with the victim; she had had a very difficult several weeks and days leading up to the day of the murder; she was likely sleep-deprived and exhausted; and she had just been caught two-timing Appellee, resulting in a drawn-out confrontation and argument by text and telephone into the early morning hours. She had a history of conflict with the victim and knew the victim wanted to move back to Palatka, which would leave her without a free caretaker for her young son. The jury readily could have concluded that the girlfriend killed the victim in a fit of anger and frustration.

In addition, the defense presented substantial physical evidence casting doubt on the girlfriend's innocence. The dead victim lay with her face and right arm uncovered within only a few feet of the girlfriend's bedroom door. The landline phone that the girlfriend said she tried to use was on the floor only a couple of feet in front of the body. The girlfriend admitted she picked up her car keys from the end table only inches away from the victim's head. She literally would have had to stand within inches of the victim's head and reach over it to retrieve her keys. The whole house was so small, and the living space even smaller of course, that the girlfriend was within scant feet of the victim's body for the fifty

minutes between the time she claimed she woke up and when she called 911. She claimed to have spent the first half of that time walking around the house taking pictures of disturbed items, all the time within feet of the body. She claimed to have noticed something dark running out of the victim's mouth, which she thought was pudding or candy, but did not mention noticing a gaping and bloody stab wound on the victim's upward-facing, and uncovered, right cheek; nor the stab wound on the exposed right arm.

When the girlfriend finally called 911, she described the rope and t-shirt first before disclosing that the victim was dead. She wasted no time in identifying Appellee as the perpetrator. She told the 911 operator she found her cell phone in the laundry room, but testified later that she found it on the kitchen table in the dining area. A witness testified that the girlfriend made statements to her that were inconsistent with the girlfriend's trial testimony, including that she had rolled the body over before calling 911.

The defense ably demonstrated that the physical evidence at the scene appeared to have been staged. The girlfriend's cell-phone pictures did not match evidence technicians' photos of the interior. The yellow fish-stringer rope, which would function properly only as one continuous piece of rope with a gig at one end and a loop at the other, was cut in two pieces; and the t-shirt appeared to have been cut in two. There was a knife from her kitchen in the bedroom as well. She claimed a sippy cup was on her nightstand when she woke up but had not been there when she went to bed; but when detectives arrived, a sippy cup was on the top bunk bed in her son's room immediately beside and aligned parallel to the knife sheath, exactly as if someone carrying both items set them there to pick up a child.

Even without defense counsel's argument about the possible temperature discrepancy, all of this is substantial evidence supporting Appellee's defensive theory that the girlfriend was the perpetrator. This presented a fair jury question, and the jury convicted Appellee after deliberating less than two hours. We cannot conclude that there is a "reasonable probability," as required by *Strickland*, that the result of the trial would have been

different if defense counsel had presented argument that there was a temperature discrepancy.

On the other side of the evidentiary scale, the State presented substantial evidence of Appellee's guilt. The jury had voluminous witness testimony and records of text messages and phone calls demonstrating both Appellee's fixation on the girlfriend and very strong dislike and resentment of the victim. The evidence of Appellee's recent rage-fueled criminal-mischief break-in added weight. The communications on the night of the murder showed that Appellee was again hurt and angry.

The timelines established two gaps of time during which Appellee could have walked the short distance to the girlfriend's house and committed the murder. He would have known that the girlfriend was a heavy sleeper and exhausted. Further, his own mother provided evidence that Appellee reappeared at her house two to three minutes after she called him at 8:19, wanting to wash and then washing some of his clothes in her washing machine, which he had never done before. The knife sheath and fish stringer came from her house, where Appellee lived. Appellee had experience as a cable technician and had installed cable at the girlfriend's rented house, and whereas the outside landline phone wire was cut, the cable was merely disconnected.

Appellee texted the victim that he was leaving his keys on the driveway, "so that I don't get accused of something I didn't do." His DNA was the only identifiable DNA on both the rope pieces and the knife sheath. A jailhouse informant, despite the usual handicaps attendant to testimony from a convicted felon with something to gain, nevertheless provided very detailed information corroborating several facts of the murder that would not have been available to the public.

On balance, in light of the evidence of Appellee's guilt and the competent testimony that it was hot inside the house at the relevant time, we cannot conclude that there is a reasonable probability that arguing a temperature discrepancy to the jury would have produced an acquittal. We therefore reverse the postconviction court's order vacating Appellee's judgments and

sentences, and remand for further proceedings consistent with this decision.

REVERSED and REMANDED.

ROBERTS and JAY, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Ashley Moody, Attorney General, and Virginia Harris, Assistant Attorney General, Tallahassee; and Sheila Ann Loizos, Assistant State Attorney, Jacksonville, for Appellant.

S. Nicole Jamieson of the Law Office of S. Nicole Jamieson, Fernandina Beach; and Susanne K. Sichta, Jacksonville, for Appellee.